979 So.2d 745 (2008)
Tammy (Prinz) PRUETT, Appellant
v.
Christopher Steven PRINZ, Appellee.
No. 2007-CA-00156-COA.
Court of Appeals of Mississippi.
April 15, 2008.
*747 Henry Bernard Zuber, Ocean Springs, attorney for appellant.
Michael J. Vallette, Ocean Springs, attorney for appellee.
Before MYERS, P.J., GRIFFIS and ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. This is an appeal from a custody modification action in which the Chancery Court of Harrison County granted Christopher Steven Prinz's motion for custody modification. Aggrieved by the trial court's ruling, Tammy Pruett, Christopher's ex-wife, appeals and raises the following issues:
I. WHETHER THE TRIAL COURT FAILED TO IDENTIFY AN ADVERSE EFFECT ON TIMOTHY;
II. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE DVD; AND
III. WHETHER THE TRIAL COURT FAILED TO CONSIDER THE EFFECT OF SEPARATING TIMOTHY FROM HIS HALF-SISTER.
¶ 2. Finding no error, we affirm.

FACTS AND PROCEDURAL HISTORY
¶ 3. The testimony showed that Tammy and Christopher were divorced in August 2000. At that time Christopher and Tammy were living in Gulfport, Mississippi. The couple had three children during the course of their marriage: Lucy, Josh, and Timothy.[1] Lucy and Josh were twenty-one and eighteen, respectively, at the time of the modification hearing in December 2006. Timothy was eight.
¶ 4. At the time of the parties' divorce, Tammy was given custody of Josh and Timothy.[2] Soon after the divorce, Tammy married James Pruett and moved to South Carolina. While in South Carolina, Tammy and James had their first child, whom they named Carmen. At the time of the modification hearing, Carmen was three years old.
¶ 5. At some point during Tammy and James's marriage, their relationship became verbally abusive, and possibly physically violent. Josh testified that typically Tammy would start yelling at James, and James would verbally retaliate. Timothy also testified that he heard them yelling at each other. On one occasion, Timothy saw James throw Tammy against the wall. Tammy testified that she never instigated any altercation with James, but she would verbally defend herself.
¶ 6. Also, Tammy testified that while she lived in South Carolina, she allowed Lucy's boyfriend, identified as Matt, to live in the *748 house with her, James, Timothy, Josh, and Lucy. This went on for two and a half to three years until Lucy and Matt married in February 2006. She stated both Lucy and Matt were over eighteen years old during the time Matt lived in her house. Tammy testified that she did not allow Matt and Lucy to sleep in the same room. She stated that Matt slept in the same room as Josh. However, Josh testified that Matt did not sleep in his room. Josh claimed that Matt slept in the same room as Lucy every night except when Tammy's mother came to visit.
¶ 7. As a result of the abusive relationship between her and James, Tammy decided to leave James and South Carolina. In mid-2006, Josh joined the South Carolina Army National Guard and left for basic training at Fort Benning, Georgia. Josh was seventeen years old at the time and still had one year of high school to complete before graduating. Soon after, Tammy took Timothy to Gulfport, Mississippi for his summer visitation with Christopher. She did not tell Josh of her plans to move. However, he eventually found out, while he was attending basic training, from a letter sent by his ex-girlfriend in South Carolina. Tammy testified that she made arrangements for Josh to stay with her sister in Ardmore, Oklahoma or with a family friend in South Carolina. However, while at basic training, Josh spoke with Christopher regarding the possibility of living with him in Mississippi. Following graduation from basic training, Josh moved in with his father and began his senior year in high school in Mississippi. Josh testified that he was never informed of his mother's arrangements. Christopher and Tammy later agreed that Christopher should have physical custody of Josh.
¶ 8. After dropping Timothy off with his father in June 2006, Tammy visited her mother for a short time in Coldwater, Mississippi. At the conclusion of her visit, she moved in with her sister in Ardmore, Oklahoma because she was offered employment with H & P Services. H & P handled accounting and bookkeeping for small businesses. In addition to her position with H & P, Tammy testified that she had a web-based business in which she recruited individuals to sell nutritional and health-related products.
¶ 9. After her move to Ardmore, Oklahoma, Christopher had difficulty contacting Tammy. He was given a post office box number and a 1-800 number to call. However, he testified that no one ever answered the telephone number provided. When he asked Tammy's mother for a direct telephone number, she explained that he did not need one. Tammy claimed at trial that her reluctance to give Christopher her actual address stemmed from her fear that James would discover her whereabouts. Additionally, further confusion surrounding Tammy's place of residence surfaced when Christopher mailed a check for child support to Tammy's South Carolina address. It was later returned as unclaimed after being forwarded to Ardmore, Oklahoma. However, following the August 2, 2006, hearing in which Christopher requested temporary custody, Tammy provided him with her sister's address and telephone number.
¶ 10. Nonetheless, Christopher was still unsure of where Tammy was actually living. When Tammy called Christopher's home in Gulfport, during Christopher's 2006 summer visitation to speak with Timothy, her telephone number was blocked from identification. Additionally, the telephone number on Tammy's website was listed to a Kenneth Davis in Colorado. Furthermore, in a letter sent to Josh while he was at Fort Benning, she used her South Carolina address as the return address, *749 but it was post marked from Denver, Colorado.
¶ 11. Tammy testified at the August 8, 2006, hearing that she did not know who Kenneth Davis was or why his telephone number was on her website. She claimed she knew the number was incorrect and asked for it to be changed. She explained that the reason her mail was postmarked from Denver was that she sent all her mail, business and personal, to H & P in Colorado to mail out in bulk. As to her familiarity with Davis, she later testified during the December 4, 2006, hearing that she was mistaken. She explained that she did know Davis, but she did not know his last name. She clarified that Davis was the son of the owner of H & P, and the owner's last name was Henry.
¶ 12. After attending Josh's graduation from basic training on August 11, 2006, Tammy returned to Coldwater, Mississippi for a short time and learned she had been essentially promoted by H & P. In combination with the promotion, she was asked to move to Littleton, Colorado. She accepted the promotion and moved to Colorado with Timothy. In advance of her move, her employer arranged a lease for a four-bedroom home. Testimony at trial indicated that Davis and his family originally lived in the house. Though she was still married to James, she testified she was going to file for divorce once she established residency in Colorado.
¶ 13. After extensive questioning during the December hearing about her relationship with Davis, Tammy admitted that they were good friends and occasionally had gone out together. She explained that he was married, but separated. She was clear that Davis had never spent the night at her house. However, Timothy testified differently. During the December 2006 hearing, Timothy testified in chambers. After initially testifying that Davis did not spend the night at Tammy's house, Timothy stated that Davis and his two sons spent the night almost every weekend. Additionally, Timothy testified that he called Davis "daddy" or "daddy Ken." Tammy testified that he referred to Davis in this way out of respect. Timothy testified that he did so because that is what Davis's sons call him.
¶ 14. As a result of Christopher's inability to locate Tammy during the summer of 2006, he filed a petition for entry of an ex parte order temporarily granting him custody of Timothy. Following a hearing in which only Christopher and Timothy were present, the trial court granted Christopher's petition on August 2, 2006, and set a hearing on the matter for August 30, 2006. During the interim, the trial court heard additional testimony on the issue from Christopher and Tammy during the August 8, 2006, hearing. Following a continuance of the August 30 hearing, Christopher filed another petition to enter an ex parte order, but he also requested permanent modification of custody of Timothy. A full hearing finally took place on December 4, 2006.
¶ 15. During the December 2006 hearing, one and a half to two hours of video footage showing Tammy's house was shown to the trial court. Christopher testified that in November 2006, he hired a private detective to conduct surveillance of Tammy. The result was a DVD that showed Davis's vehicle at Tammy's home shortly after seven in the morning on November 27, 2006. Tammy testified that Davis was there to help her take Timothy to school. She stated he did not spend the previous night at her house.
¶ 16. As to Timothy's condition since moving to Colorado, Tammy testified that he was doing well. She stated that he was making good grades and had made several friends. Additionally, she testified that *750 Timothy typically had sinus-related problems, but since moving to Colorado, his symptoms had all but disappeared. Similarly, Timothy testified that he liked Colorado better than Mississippi.
¶ 17. At the conclusion of all the testimony, the trial court found that a material change in circumstances occurred that adversely affected Timothy. The trial court found, as a result of the facts presented that: Tammy missed visitation exchanges while she lived in South Carolina; she allowed Lucy and Matt to sleep in the same room while Timothy was in the house; Timothy was exposed to domestic violence while in South Carolina; and Tammy unlawfully cohabited with a married man in Colorado. The trial court also found that Tammy coached Timothy as to his testimony regarding Davis. After finding a material change in circumstances which adversely affected Timothy, the trial court determined, applying the Albright factors, that it was in the best interest of Timothy to be in the custody of his father.[3] Finding no error, we affirm.

ANALYSIS
I. WHETHER THE TRIAL COURT FAILED TO IDENTIFY AN ADVERSE EFFECT ON TIMOTHY.
¶ 18. In order for this Court to reverse a chancellor's modification of custody we must determine that the trial court applied an improper legal standard, was clearly erroneous, or manifestly wrong. Duke v. Elmore, 956 So.2d 244, 247(¶ 6) (Miss.Ct.App.2006).
¶ 19. At trial, the parent seeking custody modification must show: (1) a material change in circumstances occurred since the issuance of the decree sought to be modified; (2) that the material change adversely affected the minor child; and (3) that it would be in the child's best interest for custody to change. Lambert v. Lambert, 872 So.2d 679, 683-84(¶ 18) (Miss.Ct. App.2003). However, the totality of circumstances should be considered in making the determination that a material change in circumstances has occurred. Giannaris v. Giannaris, 960 So.2d 462, 467(¶ 10) (Miss.2007). Additionally, "only parental behavior that poses a clear danger to the child's mental or emotional health can justify a custody change." Holmes v. Holmes, 958 So.2d 844, 847(¶ 14) (Miss.Ct.App.2007) (citation omitted). Following a finding of a material change in circumstances, the finding of an adverse effect on the child as a result of the material change must be a separate and affirmative determination. Duke, 956 So.2d at 247(¶ 7). In any event, the polestar consideration in all child custody cases is the best interests of the child. Lambert, 872 So.2d at 684(¶ 18). Lastly, cohabitation is relevant to a determination of a change in custody only to the extent it is shown such a relationship adversely affects the child. Sullivan v. Stringer, 736 So.2d 514, 517(¶ 16) (Miss.Ct.App.1999). Similarly, sexual relationships outside of marriage are not, by themselves, sufficient bases for custody modification. Id. at 518(¶ 19) (citing Phillips v. Phillips, 555 So.2d 698, 701 (Miss.1989)).
¶ 20. The trial court found that there was a material change in circumstances which was detrimental to Timothy's best interest as a result of the following: (1) Tammy missed several visitation exchanges which led to the instigation of contempt proceedings against her; (2) Tammy allowed her daughter to sleep in the same room with her boyfriend for a period of years while in the presence of Timothy; (3) Timothy was exposed to *751 bouts of fighting and domestic violence while in South Carolina; (4) Tammy left South Carolina without informing her oldest son; (5) Tammy engaged in cohabitation with a married man while in the presence of Timothy; and (6) Tammy coached Timothy to lie to the trial court concerning the specifics of her relationship with Davis.
¶ 21. Tammy argues on appeal that the trial court erred in modifying custody as she claims it did not identify an adverse impact on Timothy. Based upon the trial court's opinion and facts of this case, we disagree. The trial court mentioned the changes in circumstances, listed above, then stated: "[i]t was clear to the Court that [Tammy] had made serious attempts to coach Timothy in his testimony in [c]hambers to the Court . . . [t]his was clear in his manner and in his responses." It is clear that the adverse effect identified by the trial court stemmed mainly from Tammy's inclusion of Timothy in her attempt to keep the truth of her relationship with Davis from the trial court. During its analysis of the Albright factors, the trial court further elaborated on the previously identified adverse effect, stating:
[B]ut this Court is perhaps most concerned with the way [Tammy] has persuaded [Timothy] to assist her in hiding her highly questionable conduct, that is, an affair with a married man, from his father and from the Court. Not only does [Tammy] apparently have no qualms about lying under oath herself but she has encouraged her own young, trusting, and impressionable child to lie for her. . . . A parent is the most important role model in life that a child has. Children should be able to look to their parents with complete trust. Influencing a child to be duplicitous to hide one's own immoral behavior is a serious breach of the parent-child relationship.
(footnote omitted).[4] This Court could not agree more.
¶ 22. Based upon the record before us, we find that the trial court correctly and specifically found the requisite adverse effect prior to determining that a change in custody would be in Timothy's best interest. This issue is without merit.
II. WHETHER THE TRIAL COURT ERRED IN ADMITTING THE DVD.
¶ 23. Tammy argues that all evidence concerning the alleged cohabitation with Davis was based solely upon the DVD. She claims that under Mississippi Rules of Evidence 901 and 1002 the trial court erred in admitting the DVD.
¶ 24. Mississippi Rule of Evidence 901(a) requires "authentication or identification as a condition precedent to" the admissibility of evidence. This requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." M.R.E. 901(a). Authentication can be accomplished through someone with knowledge of the events depicted on a videotape or, in this case, the DVD. Trull v. State, 811 So.2d 243, 246(¶ 8) (Miss.Ct.App.2000). The trial court asked Tammy if the DVD accurately depicted her home and vehicle, as well as Davis's vehicle in front of her house. She positively identified all three items. Additionally, she explained to the trial court that Davis did not sleep at her house the night before the video, but he arrived that morning to help her with her children. Therefore, the DVD was properly authenticated, and no error occurred.
*752 ¶ 25. Tammy next argues that the DVD violated Mississippi Rule of Evidence 1002, commonly referred to as the best evidence rule. At trial, Tammy's attorney objected to the introduction of the DVD into evidence as he claimed the authenticity of the DVD was questionable since there was no way to tell if the DVD was edited to exclude exculpatory material. The invoice from the private investigator hired by Christopher showed that Christopher was billed for a total of eleven hours of work. Nine of those hours were identified as "surveillance/travel." Christopher testified that he had the private investigator begin surveillance on Monday, November 24, 2006. The invoice shows that six hours were billed as a result of surveillance/travel that day. However, Christopher testified that the private investigator told him Tammy was not home that Monday, and there was no activity at the house. The remaining three billed hours of "surveillance/travel" were from November 27, 2006, the day depicted in the DVD. Christopher also testified that the approximately one-and-a-half-to-two-hour video was all that was sent to him. He stated that he did not know why a portion would have been excluded, but "[the DVD] is what [the private investigator] videoed and [the DVD] is what [the private investigator] sent me."
¶ 26. Mississippi Rule of Evidence 1002 states that the original writing, recording, or photograph is required to prove the content of the medium. In the case before us, there is no indication in the record that the DVD sent to Christopher and played at trial was not the original recording of the events that occurred the morning of November 27. Similarly, there is no indication in the record that there was any other filmed surveillance of Tammy or her Colorado home at all. The fact that the invoice from the private investigator listed nine total hours billed to "surveillance/travel" does not suggest that there should have been nine hours of video to review at trial.
¶ 27. The decision as to whether evidence is admissible is within the discretion of the trial court, and its decision will not be reversed unless that discretion is abused. Bower v. Bower, 758 So.2d 405, 414(¶ 40) (Miss.2000). In the case before us, the DVD introduced at trial was properly authenticated by Tammy. Additionally, there is no evidence in the record that the DVD was not the original and complete recording of the surveillance of Tammy. Accordingly, this issue is without merit.
¶ 28. Furthermore, Tammy's statement that the DVD was the sole evidence presented at trial indicating the possible cohabitation of Tammy and Davis is false. Timothy testified that Davis and his sons spent the night at Tammy's house every weekend. Such testimony, independent from any conclusions the trial court may have derived from viewing the DVD, would be more than sufficient for the trial court to conclude that there was cohabitation between Tammy and Davis.
III. WHETHER THE TRIAL COURT FAILED TO CONSIDER THE EFFECT OF SEPARATING TIMOTHY FROM HIS HALF-SISTER.
¶ 29. Tammy argues that the trial court did not make the requisite inquiry concerning the separation of Timothy from his half-sister, Carmen, in its finding that the best interest of Timothy warranted a change in custody. She cites Holmes v. Holmes, 958 So.2d 844 (Miss.Ct.App.2007) in support of her claim. This Court in Holmes noted that Mississippi jurisprudence favors keeping siblings under the same roof. Id. at 849(¶ 22). However, in Holmes we found that the trial court did *753 not err in removing the child at issue from the company of his sibling and changing custody. Id. Undoubtedly, "[t]here is no `hard and fast' rule that the best interest of siblings will be served by keeping them together." Copeland v. Copeland, 904 So.2d 1066, 1076(¶ 43) (Miss.2004).
¶ 30. In the case before us, the trial court addressed the separation of Timothy from Carmen, his three-year-old half-sister, and Josh, Timothy's eighteen-year-old full brother, during its Albright analysis. It noted that Josh and Timothy had lived together since Timothy was born, and Josh could act as another positive role model for Timothy. The trial court also expressed concern over the allegations of violence surrounding Tammy's then-current husband, Carmen's father. In short, the trial court did consider the separation of Timothy from Carmen and Josh in its multi-factor Albright analysis prior to finding that the best interest of Timothy would be served by a change in custody. This issue is without merit.
¶ 31. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] In an effort to protect the privacy of all children involved, their names have been changed.
[2] During the initial custody determination, the trial court reserved its ruling as to who should have primary physical custody of Lucy. The issue would not be revisited prior to Lucy reaching the age of majority, and thus, it became moot.
[3] See Albright v. Albright, 437 So.2d 1003 (Miss. 1983).
[4] In the footnote to the above quote, the trial court also stated that it "noticed that the child was uneasy about being forced to choose between being either truthful . . . or being loyal to his mother."